UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES C. HARRINGTON | ) | |
| | ) | |
| Plaintiff, | ) | No. 18 C 06467 |
| | ) | |
| v. | ) | Judge Edmond E. Chang |
| | ) | |
| FAY SERVICING, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

James Harrington brought this action against Fay Servicing, alleging that Fay's debt collection practices violated the Fair Debt Collection Practices Act, 15 U.S.C. § 1692, *et seq.*, and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.*[1] R.1, Compl.[2] Specifically, Harrington alleges that, after he defaulted on his mortgage loan, Fay engaged in harassing and unfair collection tactics by making several unannounced in-person visits to his home. Fay moves to dismiss the complaint for failure to state a claim. Fed. R. Civ. P. 12(b)(6). R. 31, Mot. to Dismiss. For the reasons explained below, the motion to dismiss is denied.

---

[1]This Court has federal question jurisdiction over the case under 28 U.S.C. § 1331 because Harrington's claims arise in part under the FDCPA, 15 U.S.C. § 1692. The Court has supplemental jurisdiction over the ICFA claim under 28 U.S.C. § 1367.

[2]Citations to the record are noted as "R." followed by the docket number and the page or paragraph number.

## I. Background

For purposes of this motion, the Court accepts as true the factual allegations in the Complaint. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). Harrington's relationship with Fay began in August 2016. Compl. ¶ 17. That was when Fay acquired the servicing rights to Harrington's mortgage loan, which had gone into default several years earlier. *Id.* ¶ 13-14; 17.

Over the course of the next two years, collections representatives from Fay would allegedly make a baker's dozen's worth of unannounced visits to Harrington's home. Compl. ¶¶ 19, 21-23, 25, 27, 29. During each of these visits, the representatives delivered roughly the same version of an unsigned form letter in an envelope addressed to Harrington and marked "Personal and Confidential." *Id.* ¶ 19. The letter stated that Harrington's mortgage had recently been transferred to Fay, and that Fay was trying to reach Harrington to discuss his account. *Id.* ¶ 20. The letter also listed Harrington's options for paying off the mortgage, including repayment plans, modifications, settlements, short sale, and deed in lieu of foreclosure. *Id.* The letter concluded by asking Harrington to please call today. *Id.*

On some of these occasions, Harrington answered the door, while on others, his spouse did. Compl. ¶¶ 19, 22, 35. When Harrington was not available, the Fay representatives allegedly "demanded" to speak to him. *Id.* ¶¶ 19, 22. Moreover, Harrington's home doubled as his place of business, *id.* ¶ 25, so the visits to his home also interrupted his work. On one date, for instance, Harrington "was holding a

meeting on the front porch of his residence/place of business with his employees" when a Fay representative "appeared once more unannounced." *Id.* ¶ 26.

Here are the dates and approximate times for each alleged visit:

1. August 30, 2016

2. September 2, 2016 at 11:50 a.m.

3. March 11, 2017 at 12.46 p.m.

4. March 14, 2017 at 12.47 p.m.

5. March 18, 2017 at 10:00 a.m.

6. June 7, 2017 at 12:05 p.m.

7. June 10, 2017 at 11:50 a.m.

8. December 23, 2017 at 11:50 a.m.

9. December 30, 2017 at 1:20 p.m.

10. March 9, 2018 at 10:10 a.m.

11. June 11, 2018 at 5:45 p.m.

12. June 17, 2018 at 5:45 p.m.

13. June 23, 2018 at 10:10 a.m.

Compl. ¶¶ 19, 22, 23, 25, 26, 27, 29. Harrington alleges that, during each of these visits, either he or his spouse told the Fay representatives "to cease and desist future communication with" Harrington. *Id.* ¶¶ 24; 35. According to Harrington, as a result of these "in person face to face visits at his residence," he "has suffered emotional distress, annoyance, aggravation, and inconvenience." *Id.* ¶ 41.

3

## II. Standard of Review

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the … claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original) (internal quotation marks and citation omitted). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

## III. Analysis

## A: Notice and Cure

As a threshold matter, Fay argues that the Complaint should be dismissed entirely because Harrington failed to comply with the "notice and cure" provision in his mortgage agreement. R. 31, Def.'s Br. at 3. If applicable, the notice-and-cure provision would have required Harrington to notify Fay of his claims before filing this lawsuit in order to give Fay time to take corrective action. Here is the provision:

> **Notice of Grievance** … Neither Borrower or Lender may commence … any judicial action … that arises from the other party's actions *pursuant to this Security Instrument* or that alleges that the other party has *breached any provision of, or any duty owed by reason of, this Security Instrument*, until such Borrower or Lender has notified the other party … of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.

R. 31-1, Def.'s Br., Exh. A at 10 (emphases added).[3] Harrington argues that he was not obligated to comply with this contractual provision because he is challenging Fay's "illegal debt collection practices," not alleging a "breach of … any provision of the mortgage instrument." R. 34, Pl.'s Resp. Br. at 2.

---

[3]Harrington's mortgage agreement is attached as an exhibit to Fay's motion to dismiss. Under the incorporation-by-reference doctrine, a court may consider documents attached to a motion to dismiss without converting the dismissal motion into a summary judgment motion if the documents are referred to in the complaint and are central to the claim. *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). "In effect, the incorporation-by-reference doctrine provides that if a plaintiff *mentions* a document in his complaint, the defendant may then submit the document to the court without converting defendant's 12(b)(6) motion to a motion for summary judgment." *Id.* (emphasis added). Here, Harrington mentions the mortgage throughout the Complaint; challenges the tactics used by Fay to collect on the mortgage; and has not challenged the authenticity of the mortgage agreement. So the Court will consider the exhibit under the incorporation-by-reference doctrine.

Even assuming that Fay may invoke the notice-and-cure provision as a "Lender" under the mortgage agreement,[4] the Court holds that Harrington's claims are not brought *pursuant to* that agreement. It is true that there is no binding precedent on this issue, although two recent cases in this District interpreted identical notice-and-cure provisions in mortgage agreements. In *Michael v. CitiMortgage*, the court dismissed a borrower's RICO and FDCPA claims for failure to provide notice and opportunity to cure to the mortgage lender. 2017 WL 1208487 (N.D. Ill. Apr. 3, 2017). In that case, the mortgage agreement allowed the lender to charge the plaintiff "for services performed in connection with [the plaintiff's] default, including … property inspections." *Id.* at *2. The plaintiff's allegation, though, was that the defendant conducted *unreasonable* property inspections (in which inspectors would quickly drive past the property), in order to assess maximal property-inspection fees regardless of whether inspection services were actually necessary. *Id.* The court in *Michael* held that "all of Plaintiff's claims, even her RICO and FDCPA claims, arise out of and are entirely based on the property fees that were charged *pursuant to* her mortgage contract." *Id.* at *4 (emphasis added).

---

[4]Fay acknowledges that the plain language of the notice-and-cure provision limits application to "Borrower" and "Lender," but points to a different provision in the mortgage agreement (Section 13), which states that "[t]he covenants and agreements of this Security Instrument shall…benefit the successors *and assigns* of Lender." Def.'s Br., Exh. A at 8 (emphasis added). Fay asserts that it qualifies as an "assign" of the lender because it was given mortgage servicing rights. Def.'s Br. at 4. Thus, Fay is "entitled to the benefit of the notice and cure provision." *Id.* Because Harrington does not seem to challenge this designation in his response brief, the Court will accept Fay's argument for purposes of deciding this motion.

6

Similarly, the court in *Rodriguez* also dismissed FDCPA claims on notice-and-cure grounds, this time against a loan-servicer defendant. *Rodriguez v. Rushmore Loan Management Services LLC*, 2019 WL 423375 (N.D. Ill. Feb. 4, 2019). The debtor there alleged that the monthly mortgage statements received from the servicer "threaten[ed] to impose late fees that Defendant was not legally entitled to impose," and "attempt[ed] to collect amounts from Plaintiff that were not authorized by the agreement creating the debt or permitted by law, including but not limited to a 'late fee.'" *Id.* at *2. Here, too, the agreement contained a provision authorizing the imposition of late fees. *Id.* at *3. As in *Michael*, the court in *Rodriguez* concluded that the dispute about late fees arose from "actions that Defendant purportedly took pursuant to the Mortgage—in particular, adding late fees to the amount that Defendant told Plaintiff would be due if Plaintiff were to bring her mortgage current." *Id.*

Unlike *Michael* and *Rodriguez*, though, Harrington's claims do not stem from actions that Fay took pursuant to the mortgage agreement itself.[5] True, the mortgage

---

[5]By distinguishing Harrington's case from *Michael* and *Rodriguez*, the Court is not necessarily endorsing the reasoning in those two cases. The Court is skeptical that contractual notice-and-cure provisions like the one in this case can be applied universally—as long as the challenged conduct arises "pursuant to" the contract at issue—to delay or waive recourse under federal (or state) statutes. Consider, for instance, if an employment contract required employees to provide notice and an opportunity to cure to their employers before bringing employment-discrimination claims. Would a Title VII discrimination claim thus be subject to the contractual notice-and-cure requirement? Any alleged discriminatory conduct would presumably be taken "pursuant to" the employment contract in the same way that a loan servicer's harassing conduct comprises an action taken "pursuant to" the mortgage. It is one thing to overlay contractual requirements that do not in effect extinguish a federal claim, such as agreeing to arbitrate an FDCPA or Title VII claim. It is quite another for a lender (or employer in the Title VII example) to require that it be given a chance to "cure" a federal statutory violation before a suit's filing. Indeed, what even would a "cure" be to harassment under the FDCPA? Just a promise to stop in the future? Or would money damages be

7

agreement here is the but-for cause of the existence of any relationship between the parties—presumably, Fay would not be engaging in any allegedly unlawful collections tactics if Harrington had not defaulted on the payments that he agreed to make under the mortgage agreement. But this is a far cry from the situations in *Michael* and *Rodriguez.* In *Michael*, the contract itself authorized the defendant to conduct property inspections and assess inspection fees on defaulted homeowners; by arguing that the inspections were unreasonable and the fees unlawful, the plaintiff was essentially challenging the scope of that *contractual* provision. Similarly, in *Rodriguez*, the contract provided for the imposition of late fees, and the plaintiff's FDCPA claim was premised on the argument that the late fees charged under the *contractual* language were unlawful. In other words, both claims, although brought as FDCPA violations, could be properly characterized as a breach of a contractual provision in the mortgage agreements themselves.

In contrast, Harrington's claims cannot be reframed in that way. He does not challenge Fay's baseline authorization to service his debt. Nor does he allege that Fay is charging fees pursuant to a contract provision that he thinks ought not apply to him or taking any action based on an incorrect or unlawful interpretation of one of the contract provisions. There is no way to characterize his *harassment* claim—premised on a series of visits to his home—as a violation of the language in the contract, nor do Fay's actions here have a home in any of the contractual provisions.

---

required? If yes, how much money? Notice-and-cure provisions do not seem to square well with many federal statutory violations.

This limited interpretation of the "pursuant to" language comports with the case law on this issue. *Rodriguez* undertakes an extensive survey of out-of-circuit cases that "come down on the side of enforcing the notice and cure provision in cases where the plaintiff brings a statutory claim that is based on actions that the defendant took pursuant to the plaintiff's mortgage." *Rodriguez*, 2019 WL 423375, at *4 (collecting cases). But plenty of other cases come down on the other side and do *not* apply notice-and-cure provisions in mortgage agreements where purely statutory rights are being enforced. *See McShannock v. JP Morgan Chase Bank N.A.*, 2018 WL 6439128 (N.D. Cal. Dec. 7, 2018) (holding that notice-and-cure provision did not apply where debtor's claim based on failure to pay escrow interest in mortgage accounts had an independent basis in state consumer protection statute); *St. Breux v. US Bank, Nat'l Ass'n*, 919 F. Supp. 2d 1371 (S.D. Fla. 2013) (holding that notice-and-cure provision did not apply where FDCPA lawsuit was based on defendant's alleged failure to comply with a statutory disclosure duty under the Truth in Lending Act); *Kim v. Shellpoint Partners, LLC*, 2016 WL 1241541 (S.D. Cal. Mar. 30, 2016) (holding that notice-and-cure provision did not apply to action challenging mortgage servicing fees where claims arose under state statute, not contract); *Gerber v. First Horizon Home Loans Corp.*, 2006 WL 581082, at *3 (W.D. Wash. Mar. 8, 2006) (holding that notice-and-cure provision did not apply where state consumer protection claim "involve[d] allegations of deceptive business practices" and "clearly exist[ed] independent of any contract between the parties").

A case from this District, too, concluded that a plaintiff's failure to comply with an identical notice-and cure-provision did *not* warrant dismissal where "the notice and cure provision … effectively permitted the lender to contract its way around TILA's disclosure requirements." *Abercrombie v. Wells Fargo Bank, N.A.*, 417 F. Supp. 2d 1006, 1008 (N.D. Ill. 2006). In *Abercrombie*, the court highlighted the absurdity of applying a notice-and-cure provision to claim that a lender failed to disclose a security interest in violation of TILA, because "any such corrective action would, by definition, come too late to permit the borrower to compare credit terms: by that point, the borrower has already contracted with Wells Fargo and no longer has a choice among potential lenders." *Id.* To be fair, this case is not entirely comparable, because Harrington would not be *waiving* his right to assert claims under the FDCPA—rather, he would theoretically just have to go through the notice-and-cure process before doing so. But like *Abercrombie*, this case is a poor fit for the provision, because it is unclear how an opportunity to cure could have resolved the need for litigation here. *See supra* n.5. Harrington is not challenging something like a misstatement or an unlawful finance charge where the lender acted based on the mortgage agreement and the harm can be addressed by simply deleting the error. Harrington is bringing a harassment claim premised on a series of unannounced visits to his home. These visits already happened, and Fay cannot unring the metaphorical bell (or in this case, the actual doorbell). It is unclear what an opportunity to cure would have accomplished in this case, aside from delaying Harrington from suing to enforce his federal and state statutory rights, which, given

10

the circumstances of his claims, he would have done regardless of whether Fay was provided an opportunity to cure or not. This gap between the supposed "cure" and Fay's conduct highlights why it is that Fay was not acting "pursuant to" the mortgage agreement. Harrington was thus not required to comply with the contractual notice-and-cure provision.

## B. FDCPA Claim

This brings us to the merits of the claims. First, Harrington alleges that Fay violated Sections 1692d and 1692f of the Fair Debt Collection Practices Act. Fay moves to dismiss, arguing that (1) at least some of the claims are barred by the statute of limitations, and (2) Harrington failed to allege how "hand delivery of the letter constitutes harassment or unfair practices." Def.'s Br. at 6.

### 1. Statute of Limitations

Although the statute of limitations is an affirmative defense, dismissal under Federal Rule of Civil Procedure 12(b)(6) is nonetheless "appropriate if the complaint contains everything necessary to establish that the claim is untimely." *Collins v. Village of Palatine, Ill.*, 875 F.3d 839, 842 (7th Cir. 2017). In that circumstance, the motion may be considered a Rule 12(c) motion for judgment on the pleadings, namely, just the complaint itself. *Brooks*, 578 F.3d at 579. Here, Harrington has provided unambiguous dates for each alleged violation.

FDCPA claims are subject to a one-year statute of limitations. 15 U.S.C. § 1692k(d). Harrington does not contest this—he alleges in the Complaint that he "is only seeking damages under the FDCPA for violations that occurred within one year

11

of the date of the filing." Compl. ¶ 47. Harrington filed the Complaint on September 21, 2018, so any conduct before September 21, 2017 is no longer actionable. Thus, this knocks out the August 30, 2016, September 2, 2016, March 11, 2017, March 14, 2017, March 18, 2017, June 7, 2017, and June 10, 2017 visits.

### 2. Section 1692d Harassment

But that still leaves six visits to his home—on December 23, 2017; December 30, 3017; March 9, 2018; June 11, 2018; June 17, 2018; and June 23, 2018. Under § 1692d, a "debt collector may not engage in any conduct the natural consequence of which is to harass, oppress, or abuse any person in connection with the collection of a debt." 15 U.S.C. § 1692d. Harrington alleges that Fay's repeated visits violated Section 1692d because Fay "could have easily contacted [Harrington] via mail, but chose not to do so," which suggests that Fay's "motivations in using repeated, and unwanted, in-person contact were to harass [Harrington] into contacting [Fay]." Compl. ¶ 38. Harrington also alleges that "nearly on every occasion," either Harrington or his spouse told Fay "to cease and desist future communication with" Harrington. *Id.* ¶ 37. According to Harrington, these visits caused him "emotional distress, annoyance, aggravation, and inconvenience." *Id.* ¶ 41.

The statutory provision actually provides specific (but non-exclusive) examples of harassing conduct—for instance, "obscene or profane language," 15 U.S.C. § 1692d(2), or "[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass," *id.* at § 1692d(5)—but none of these explicitly address in-person visits. Generally

12

speaking, however, whether a debt collector's conduct qualifies as harassment often is a question for the jury. *Losch v. Advanced Call Center Technologies, LLC*, 2017 WL 1344524, at *3 (N.D. Ill. Apr. 12, 2017) (citing *Jeter v. Credit Bureau, Inc.*, 760 F.2d 1168, 1179 (11th Cir. 1985)).

The facts alleged by Harrington are sufficient to state a claim under § 1692d. Harrington alleges that Fay's representatives visited his home at least six times in a roughly six-month period from December 2017 to June 2018. Compl. ¶¶ 27, 29. And three of those visits occurred just days apart from each other within a single month (on June 11, 17, and 23). *Id.* ¶ 29. It is true that case law on harassment often involves a greater volume of communications, but those cases involve harassing *phone* calls. *See Losch* 2017 WL 1344524 (denying motion to dismiss FDCPA claims where debt collector called plaintiff 87 times over nineteen days); *Kube v. Creditors Collection Bureau, Inc.*, 2012 WL 3848300 (N.D. Ill. Aug. 30, 2012) (denying motion for summary judgment on FDCPA claims where debt collector called plaintiff 98 times over nine months); *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803 (N.D. Ill. 2010) (denying motion for summary judgment on FDCPA claims where debt collector called plaintiff 31 times over twelve days). But some § 1692d cases involving phone calls have also survived motions to dismiss based on much smaller numbers. *See Bruner v. Allianceone Receivables Management, Inc.*, 2017 WL 770993 (N.D. Ill. Feb. 28, 2017) (eleven phone calls over six weeks); *Carr v. NCO Fin. Sys., Inc.*, 2011 WL 6371899 (E.D. Pa. Dec. 20, 2011) (nine phone calls); *Valentine v. Brock & Scott*, 2010 WL 1727681 (D.S.C. Apr. 26, 2010) (eleven phone calls).

13

Despite the smaller quantity of contacts, the *nature* of the contacts makes this an easy case to get past the dismissal-motion stage. Fay sent its collectors to Harrington's *home*. They arrived *unannounced*. And they kept doing it even after they were told to *stop* visiting. Fay did all this even though less intrusive phone calls or mailings were an easy alternative. The relative lack of case law precedent on in-person visits by debt collectors suggests that there is at least a plausible argument that this sort of conduct is simply not as common as phone calls, precisely because it is more invasive to debtors. Indeed, this sentiment is expressed in a 2015 Compliance Bulletin from the Consumer Protection Financial Bureau:

> Finally, sections 806 and 808 of the FDCPA prohibit, respectively, a debt collector from engaging in any conduct the natural consequence of which is to harass, oppress, or abuse any person, and from using unfair or unconscionable means to collect or attempt to collect any debt. *In-person collection visits* may pose a heightened risk that collectors will violate these provisions.

CFPB Bulletin 2015-07, In-Person Collection of Consumer Debt (Dec. 16, 2015), *available at* https://files.consumerfinance.gov/f/201512_cfpb_compliance-bulletin-in-person-collection-of-consumer-debt.pdf (emphasis added). This bulletin is certainly not dispositive, but taken together with Harrington's allegations that he and his spouse repeatedly asked Fay to stop, a reasonable jury could agree that a debt collector's six in-person visits to a home, three of which occurred within the same month, constituted harassing behavior. Harrington's harassment claim survives at this stage.

### 3. Section 1692f Unfairness

Harrington also alleges that the same conduct—"repeatedly appearing unannounced at Harrington's house or place of business at inconvenient times, in order to hand deliver a letter which could have been mailed"—violated § 1692f of the FDCPA. Compl. ¶ 40. To state a § 1692f claim, a plaintiff must allege that the defendant used "unfair or unconscionable means to collect or attempt to collect any debt." 15 U.S.C. § 1692f. This is judged according to an unsophisticated-consumer standard. *See McMillan v. Collection Prof'ls, Inc.*, 455 F.3d 754, 765 (7th Cir. 2006). An unsophisticated consumer "may be uninformed, naïve, and trusting, … but has rudimentary knowledge about the financial world and is capable of making basic logical deductions and inferences." *Wahl v. Midland Credit Mgmt., Inc.*, 556 F.3d 643, 645 (7th Cir. 2009) (cleaned up).

The Seventh Circuit has noted that "the phrase 'unfair or unconscionable' is as vague as they come." *Beler v. Blatt, Hasenmiller, Leibsker & Moore, LLC*, 480 F.3d 470, 474 (7th Cir. 2007). But like the § 1692d harassment claim discussed above, Harrington's § 1692f unfairness claim will require "a fact-bound interpretation." *See McMillan*, 455 F.3d at 759. Thus, accepting Harrington's allegations as true, the Court cannot hold that, as a matter of law, Fay's home visits do not violate § 1692f, so this claim also survives the motion to dismiss.

### C. Consumer Fraud Act

Harrington also brings a claim under the Illinois Consumer Fraud and Deceptive Practices Act, which broadly prohibits "unfair or deceptive acts or

practices." 815 ILCS 505/2. Plaintiffs can bring claims "for deceptive business practices and also for business practices that, while not deceptive, are unfair." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 575 (7th Cir. 2012) (cleaned up). Here, Harrington only brings an unfairness claim. Specifically, Harrington alleges that "[i]t was unfair for Defendant to seek to collect the subject debt from Plaintiff through means of harassment and intimidation, by repeatedly appearing unannounced at Plaintiff's home and place of business, in order to induce him into making a payment on the subject and disputed debt obligation." Compl. ¶ 54. Fay's conduct, Harrington alleges, "only served to harass and intimidate Plaintiff into paying the subject debt and was designed to bludgeon Plaintiff into paying the alleged debt." *Id.* ¶ 53.

### 1. Unfair Practice

Although the statute does not define "unfair," the "Act is liberally construed to effectuate its purpose." *Wigod*, 673 F.3d 574 (quoting *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002)) (cleaned up). Illinois courts consider three factors to determine whether a practice is "unfair" under the statute: (1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers. *Robinson*, 775 N.E.2d at 961. Not all three factors need to be satisfied to support an unfairness claim; a practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. *Id.* Unlike a claim for deceptive conduct, a claim for "unfair practices under the Consumer Fraud Act need only meet the notice pleading standard of Rule 8(a), not the particularity requirement in Rule

16

9(b)." *Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008).

For many of the same reasons as explained in the FDCPA analysis earlier in this Opinion, Harrington has plausibly stated a claim for an unfair practice under the Consumer Fraud Act. Especially in light of the CFPB bulletin cautioning debt collectors against in-person visits, as well as the fact that this does not appear to be a common practice (at least based on the relative lack of case law involving in-person debt collection visits), the Court cannot conclude as a matter of law that Fay's conduct does not constitute an unfair practice. Harrington alleges that Fay's conduct is both coercive and "against public policy because it needlessly subjects consumers to this harassing behavior." Compl. ¶¶ 55-56. Moreover, Harrington alleges that Fay's practice of unannounced in-person home visits "is done on a large scale" and that Fay "systematically engages in such harassing conduct against consumers in Illinois in order to aggressively collect debts in default, or assumed to be in default, to increase their profitability at the consumers' expense." *Id.* ¶¶ 57-58. Fay does not specifically contest these allegations in its response brief. Thus, Harrington has met the minimal pleading standard required to allege an unfair practice.

### 2. Actual Damages

Fay nonetheless argues that Harrington's Consumer Fraud Act claim must be dismissed for failure to plead actual damages, which requires some showing of financial harm. Def.'s Br. at 8-9. It is true that Section 10a of the Consumer Fraud Act creates a private right of action for only violations that result in "actual damages":

17

> Any person who suffers *actual damages* as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award *actual economic damages* or any other relief which the court deems proper…

815 ILCS 505/10a(a) (emphasis added). But as this Court previously observed in *Duarte v. Convergent Outsourcing*, the question of whether the "actual damages" element automatically requires a showing of pecuniary harm is not as clear cut as recent case law makes it out to be. *See Duarte v. Convergent Outsourcing, Inc.*, 2018 WL 3427910 (N.D. Ill. July 16, 2018). Specifically, Illinois case law is actually not explicit on whether economic damages are required for a private plaintiff to state an *unfairness* claim, as opposed to a deception claim. The Illinois Supreme Court has not addressed this issue.[6] And the Illinois Appellate Court cases that Fay cites in support—*Cooney v. Chi. Pub. Schs.*, 943 N.E.2d 23 (Ill. App. Ct. 2010); *Morris v. Harvey Cycle & Camper, Inc.*, 911 N.E.2d 1049 (Ill. App. Ct. 2009); *Mulligan v. QVC, Inc.*, 888 N.E.2d 1190 (Ill. App. Ct. 2008)—all involve claims of either deception or general unlawfulness, *not* unfairness. Tracing back the Illinois Appellate Court line of cases reveals a misapprehension of the first case that expressed that "actual damages" can cover monetary loss—not that the Consumer Fraud Act is limited to monetary loss. *Duarte*, 2018 WL 3427910, at *5-6.

---

[6] Fay does cite an Illinois Supreme Court case, *Price v. Philip Morris, Inc.*, 848 N.E.2d 1 (Ill. 2005), but that case deals with a deception claim, not an unfairness claim. Moreover, the case at most suggested (via a concurrence) that "actual damages" were required to pursue a private right of action under the Consumer Fraud Act, but did not necessarily extend that requirement to actual *economic* damages specifically. *See Price*, 848 N.E.2d at 55 (Karmeier, J. concurring) ("Actual damages are thus an element of a private right of action under the statute.").

18

Moreover, although Illinois Appellate Court authority is entitled to "great weight" on matters of Illinois law, when there are "persuasive indications" that the state supreme court would disagree with the intermediate appellate court, then the federal court must decide the case as it predicts (as best as it can) the state supreme court would. *Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 637 (7th Cir. 2002). Here, looking to the text of the statutory provision itself, there is a clear distinction between the "actual damages" requirement and the phrase "actual *economic* damages," which appears later on in the provision. 815 ILCS 505/10a(a) (emphasis added). Namely, the word "economic" is conspicuously absent from the phrase "actual damages." This absence suggests that the private right of action does not necessarily require the establishment of economic harm. *Duarte*, 2018 WL 3427910, at *7.

In this case, Harrington has alleged that as a result of Fay's "in person face to face visits at his residence," he "has suffered emotional distress, annoyance, aggravation, and inconvenience." Compl. ¶ 41. Accordingly, the Court concludes that Harrington has adequately alleged "actual damages," so the motion to dismiss is denied.

## IV. Conclusion

For the reasons discussed, Fay's motion to dismiss is denied. To allow the parties some time to review the opinion, the status hearing of October 3, 2019 is reset to October 16, 2019, at 10 a.m.

ENTERED:

　　　　s/Edmond E. Chang　
Honorable Edmond E. Chang
United States District Judge

DATE: September 30, 2019